222544, Aracich v. Board of Trustees. For the appellant, Mr. Smith. Thank you. Good afternoon to the panel. May it please the court. Matthew Aracich challenges the district court's dismissal of the causes of action in his complaint as an abuse of discretion. I think when we consider that, whether or not the district court acted properly, I think it's useful to consider the language that was used by the Western District of New York District Court in Metzger. It's on page 8 of my reply brief, where they denied a motion to dismiss on nearly identical causes of action. And the court said, the district court denied the defendant's funds motion to dismiss plaintiff's anti-cutback cause of action, a 204G cause of action similar to, identical basically to what Mr. Aracich has, and permitted discovery from the defendant pension fund holding. In Hines, the Supreme Court determined that the pension fund's amendment of the plan to eliminate the exception for employment in a supervisory capacity from the definition of disqualifying employment in a suspension of benefits provision subsequent to Hines' retirement violated the anti-cutback rule, explaining, Hines worked and accrued retirement benefits under a plan with terms allowing him to supplement retirement income by certain employment. And he was being reasonable if he relied on those terms in planning his retirement. The 1998 amendment undercut any such reliance. But there was no amendment here. So I believe that there was an amendment. I believe that if you use the Hines definition of an amendment that says that if somebody has an expectation pre-retirement of a post-retirement ability to work, and that expectation is frustrated, then that can constitute an amendment. So says the Supreme Court. Everybody who loses an application for benefits will experience frustration. But if every denial of benefits was turned into a cutback without an actual amendment of the wording, well, then there would really be no discretion left for the trustees, or am I wrong? So I'm not going to say you're wrong, Your Honor, but I'm going to say- That's okay. My colleagues often do. No, no. I would just point you to the actual provisions in the plan that provide that an individual such as Mr. Arasich, when he does retire, he retires as that term is defined under the plan if he ceases work in covered employment. If he's separated, if he separates from covered employment. Well, it says separates from, right, covered employment. Right, that's right. And, in fact, there's an admission in the May 21st denial letter. You guys agree, right? Yes. May 21st denial letter. They admit that he is no longer an individual who is working- He's no longer an individual who's in covered employment. It's not clear that he's separated from it, right, because he's still working for the same employer. Well- Well, I guess just to go back, I'll ask you that question in a second, but just to go back to your point about Metzger. So in Metzger, at least there was a reinterpretation of the plan, right? The trustees had adopted one interpretation and then adopted a new interpretation that revised the way they had read the plan earlier. I guess you can debate about whether that's an amendment or not because it's a reinterpretation, which might have changed things. They didn't actually amend the plan, but they thought about it differently. But here, I mean, do you have an example where previously the trustees did say that if your covered employer stopped contributing to the plan, then you're considered retired, and now they reconsidered that position, or is this the first time they've addressed that issue? So I think it's important to remember that we're at the 12B stage. There's been no issue joined. There's been no discovery whatsoever. I have a question about whether there was an amendment. Yes. Right? So there was no formal amendment. Nobody actually changed the text of the plan here. We don't know that. You don't know that? No, we have no discovery on that yet. Well, the letter from the plan denying the claim for benefits does not purport to rely on any new provision of the plan, right? But now we're wading into the merits, and I think the only inquiry under Twombly is whether my client plausibly alleged a cause of action under any theory of the law. So, for instance, my client has alleged in the complaint, and we can take it out and go through the provisions, that the trustees, in refusing to honor his retirement, even though they admit that he has ceased covered employment, and that the term covered employment is the very definition of retirement in the plan, he certainly alleged a cause of action that should be allowed to proceed at least to the discovery stage. We can have more of a discussion once everybody — So what would turn up in discovery that would change, that might affect the result? So some things that might turn up, and that Matt's — The district court thinks that the plan says separated from covered employment, right? That's when you're retired. To be considered retired, a participant must have separated from covered employment, right? And so the district court says, well, there's an ambiguity there because here his employer stopped being a covered employer by stopping contributions to the plan, but he continued to work there throughout. In fact, he didn't leave the employer, and so there's a question of whether he actually separated from the employer, right? That's an interpretation of the language and whether there's an ambiguity there. I don't see — what would discovery tell us about the answer to that question? So discovery would tell — would tell, for instance, we could look at the trustee minutes and see whether there was bias, and I, upon information and belief, I think there were, that who retired between the ages of 60 and 65 continued working either for the same employer or for other employers. It's a distinction without a difference. So I get that. If they're plausible allegations that it was based on bias and not on good faith interpretation of the plan, maybe that makes sense. But isn't your claim that this is contrary to the terms of the plan? It is. And at A239 of the appendix, we can look — So if a court, the district court or us, were to think that you're wrong about that, that actually this is a statistical interpretation of the plan, one that's not arbitrary capricious or maybe is even just correct depending on the standard of review, there would be no cause for discovery, right? Because it would be based on the terms of the plan. No, I think there would be cause for discovery. We don't even know if there has been amendments to the plan, what the history of — That would be reflected in trustees' minutes, for instance, for particular provisions relating to retirement. This is a very political environment. We don't know whether there's any bias or other — we just don't know because we've had no discovery whatsoever. When you're speaking in terms of changes of position for people in similar circumstances who got their pension, you're really referring back to Metzger. And Metzger is a case in which, as you described it, someone who worked for years on one assumption, that benefits would be calculated in a certain way or be available under certain circumstances, and were not. If that was the case, your client would now be able to say, this was the prior interpretation, this was my understanding of it, and I'm now being deprived of the arrangement that I paid in under all of these years. Yes, well, Metzger, the plan provisions were different. First of all, Metzger, in that plan, they required a complete retirement. Here you just — and you can just look at the plan itself and you can say, if somebody ceases covered employment, and that employment is very specifically set forth. So in Metzger, there was a whole analysis, and I remember in oral argument, for instance, there was a whole discussion about what does it mean to retire, and the trustees were given a lot of discretion there because there was no definition of retirement in the plan. Here we've got the opposite. We've got a specific definition of retirement, both in the SPD and in the plan document. The plan document certainly trumps to the extent the SPD might be inconsistent, but we've got a specific definition, which my client relied upon, as to what constitutes retirement. It says specifically, retirement to be considered retired, a participant must have separated from covered employment. However, the plan's rules as to what constitutes — But I guess — sorry, finish the — Sure. So it says, and I'm reading from page 8239 of the appendix, section 68 of the plan. It says, however, the plan's rules as to what constitutes retirement and separation from covered employment for purposes of retirement differ for periods before attainment of normal retirement age and after attainment. And then they refer you to the suspension of benefits provision, which that's a little bit unusual. Usually you keep the suspension different, but here you've got the suspension of benefits clauses incorporated by reference into the actual definition of retirement. But the suspension of benefits clauses just describe what disqualifying employment would be, right? It is. It's stating that — So that doesn't really tell us about the definition of what constitutes retirement. I think it does because you've got, in the last clause there, it says, is any employment covered by any collective bargaining with the union? So that clause is incorporated specifically in section 68A as to what constitutes — You're saying disqualifying employment would be anything covered by the collective bargaining agreement. So you're saying that your client is not engaged in disqualifying employment. I'm saying that my client — That's true, right? Like it's not disqualifying employment under the plan. But the question is not whether he's engaged in disqualifying employment now. The question is whether he's retired. That is, whether he separated from covered employment. And the trustee's argument is that he didn't because he was continuously working before and after the time he claimed to retire. Well, this is all appropriate for the dispositive motion stage. But at the pleading stage, I think my client has plausibly alleged a violation of the agreement. Can I just ask you about that? I mean, the letter that he sent to the plan, he says, I'm notifying you that I will be retiring from local union number 12, effective 4 p.m. today, Friday, February 26, 2021. I mean, hadn't he stopped working at union number 12 years before that? Well, he was working at the council under participation agreement. Right. So he's no longer an employee of local union number 12 in 2021, right? I don't believe so. So what does he mean when he says, I'm notifying you that I will be retiring from local union number 12, effective 4 p.m. today, Friday, February 26, 2021? Well, the plan administrator, Al Wassel, took that to mean that he was applying for his retirement. No, I understand. But I'm just asking what he meant. Because he had already retired from local union number 12, right? He had gone to work at the council, right? So he doesn't say I'm retiring from the council. He's saying I'm retiring from an employment that I stopped working for two years ago. What does that even mean? Well, what he meant was that he had reached the age and service requirements and was filing an application to receive his pre-retirement benefit. Right. But I guess so he's trying to purport to be retiring. But this obviously doesn't describe a real phenomenon. He did not retire from local union number 12 on Friday, February 26, 2021. Right. He had stopped working there in 2018. Well, you're referring to the original letter that he sent to the fund manager, which I think was deemed to be an application for retirement. So I think that's a moot issue. But even assuming you understand what you're saying, that the definition of retirement is like so clear and obvious that we shouldn't defer at all to the trustees. And I'm saying he's using the word retire in a way that I don't even understand. He says I'm retiring from an employer that I haven't worked at for years and therefore I want benefits. But that doesn't. Well, that's going to explain to me what it means that he says in 2021, he was retiring from an employer that he hadn't worked for since 2018. Well, he's a layperson and he submitted that to Al Wessel. His intention was to retire under the plan and receive his benefits. But when Al Wessel denied his pension, this firm filed a much more comprehensive statement as to exactly what he wants. And that statement was that he wants to. How many people in the council were participating in this retirement plan? How many people are in this retirement plan? No. How many people working for the council when your client was working for the council were in the retirement plan? I'm only aware of Mr. Arasich, but I could be wrong. So so just in this letter. I'm sorry. Go ahead. Then is it possible that what the council was doing was participating in paying their share of the dues for his continuing to be a member of District 12? Well, in terms of the plan, what the council is going to be in the plan, he has a member of a union. Right. Well, if he's in the plan, he has to either be a party to a clip. There has to be a collective bargaining agreement that covers him as an employee with a contribution obligation. Or there can be a participation agreement that the funds agree to. And we've got an example that's done. But this is done by participation agreement in which the council agrees to participate. Well, they agree to make contributions to the funds on his behalf. Twenty nine U.S.C. one eighty six only requires a detailed writing setting forth the contribution obligation. And that's what the participation agreement amounts to. We've got. So we've got. I think in terms he certainly if you look at the complaint, he's plausibly alleged all of the causes of action. He's alleged that there was a violation of the specific terms of the plan to show that he was actually retired. And that there's no question that he was engaged in covered employment. And so. He was actually retired. Before. But like you don't. You know, he was not retired from the council, from the employer he had been working for. Well, he was retired from covered employment. So covered employment is more than just working for the council. Covered employment entails being covered by a collective bargaining. I understand. It's just that your definition of retired or the one that you the interpretation of the plan that you advocate means that he could be continuously working for his current employer. And yet he retired. It's not my definition. It's that section six, seven and six, eight and six, nine of the plan. Is that language that you're just discussing, is that standard in such employee benefit plans? Well, certainly. Or is it unique in one office? Certainly eligibility clauses are present almost universally. No, I understand that, clearly. If there are no eligibility clauses, you really couldn't have a plan at all. I guess standard's a relative term. Is this clause standard in any sense, or is it otherwise commonly used? Well, I think you could say, I think there was a St. Louis Carpenter's case. There's other unions that say that if you cease working for covered employers, or if you cease work in the industry, then you're entitled to a retirement. The idea being that the Internal Revenue Code never intended to ban people from employment post-retirement. And so as long as he meets the terms of the plan itself and also meets the terms of the Internal Revenue Code, and we can talk about that because they cited a private letter ruling. But that, first of all, the private letter ruling that's cited says that it doesn't have any precedential value. And then if you go back to Hines, Hines says that it doesn't matter what guidance or what the IRS may be doing behind the scenes. If we have a code like 411D6, which is an anti-cutback provision, which is basically the equivalent of 204G, if we have that code in place with law and precedent behind it, then that's what controls. And Hines was clear that in a situation where somebody has a pre-retirement expectation of being able to engage in certain post-employment work, and that expectation is reasonable based on the terms of the plan. So it's got to be right that a ruling from the IRS can't modify the terms of a contract, right? So if it were clear that he's entitled to benefits, the fact that the IRS doesn't like that policy and might even threaten the tax-exempt status of the plan wouldn't be a reason to not enforce the contract. But the argument here is that the contract itself is ambiguous, right? And the trustees were interpreting the plan to be consistent with what they thought, you know, how the IRS would react to it. And the plan incorporates IRS standards into it. I don't think the – if you're talking about the plan itself as a contract, I don't think it was ambiguous at all. It says specifically covered employment, and it defines exactly what it means by covered employment. Right. So the argument really depends on whether it was ambiguous. No. Well, the evaluation of what discretion you would give to the trustees would depend. And so, for instance, under what the Frommer v. Conkright case, the – when you're now saying – when you're applying the Firestone v. Bloop standard of deference, you're going to – that teaches that you're supposed to apply trust law. And trust law would be in two scenarios. One, you're trying to basically evaluate whether the trustees were acting reasonably. So the idea is that a set law of a trust normally wants to give the trustee a certain amount of deference and discretion so he can do his job. But if it's found to be unreasonable – so, for instance, if there was a violation of the law, if a court were to find 411D6 was being violated by denying Mr. Arasitz his pension, as an example, then the court has full discretion. And then the second restatement of trust states that you have the ability – the court has the ability to control the trustee, in other words, to guide them back into compliance with the law. And so here, if you – if you applied that Frommer standard, you could look at the specific language that was relied upon by Mr. Arasitz to cover employment. He had a reasonable expectation that covered meant employment covered by a collective bargaining agreement because that's exactly what it says in section 6-9 and 6-8. And he relied upon that. I mean, he's a member with 30-plus service credits. I think we have that argument. You've reserved some time for rebuttal, so we'll hear from you again. But let's turn to the appellee, Mr. Clark.  Good afternoon, and may it please the court, Joe Clark on behalf of appellees. At issue in this appeal is whether a plan participant can begin receiving retirement benefits, even though he continues to work for the same employer in the same position. The participant in question, Mr. Arasitz, is the president of the Nassau-Suffolk Building Trades Council.  He entered into a participation agreement with the funds that enabled him to remain a plan participant. When he turned 60, he arranged for this participation agreement to be terminated and almost immediately thereafter argued he was entitled to start receiving his benefits because the council was no longer a contributing employer. The funds trustees rejected this argument, and in dismissing Mr. Arasitz's claim the district court held that this decision was not arbitrary and capricious. Does it matter that he arranged for the council to stop participating in the plan? I don't think that it's dispositive of the outcome in this case. I do think that if there's some argument that the equity should be considered here, and again I think we would rely on the terms of the plan and the deferential arbitration versus standard of review, that I would just want to point out that, as Judge Jacobs also did, Mr. Arasitz was the only employee of the council who was covered by this participation agreement. He was president of the council, and the council terminated the participation agreement at his direction. Doesn't that actually, in a way, your argument that the employee has to separate from covered employment, meaning leave the employer, is like he made the decision for the employer to leave the plan, doesn't it? Doesn't it actually strengthen the case that he engaged in a separation from covered employment if he decided to leave the plan? Well, respectfully, Your Honor, no. I think that the operative word being separate, and I think the ordinary meaning of separate as sever or withdraw from, that's the term that the trustees focused on. Right, but he doesn't have to be separated from his employer. It says a participant must have separated from covered employment, right? So is Mr. Arasitz still in covered employment? No, and there's no dispute that he's. So, in fact, if at this time, February 2021, let's say he had been working for the union up until then, and then he retired from the union at that point and asked for his pension, and subsequent to that went to work for the council, he'd get the pension, right, because the council is not disqualifying employment. That's correct. So it's the happenstance that he started working at the council before asking for the pension that now he can't get it at all until he stops working for the pension? Well, respectfully, I wouldn't characterize it as happenstance. So putting aside whether or not the language is unambiguous in favor of the trustee's ultimate decision here, the trustees are directed by the plan document to construe the plan in a manner that would preserve the plan's tax qualified status. Those tax qualification rules generally provide that you cannot start paying pension benefits to someone unless they've reached normal retirement age or they've retired. Mr. Arasich, at the time of his application, was 60 years old, so he had not reached normal retirement age yet. This plan defines that at 65. So the question was really whether he had retired, and there is guidance. Mr. Smith alluded to the private letter ruling from the IRS that defines what a retirement is in this context for purposes of maintaining your tax qualified status. I'd also argue that the ordinary understanding of the term— But you're telling me that the IRS would be okay with it if he stopped working for the union at 60, got a pension, and then kept working for the council after that. But if he started working for the council at 59 and sought a pension at 60 and kept working for the council after that, the IRS would find that unacceptable. You see how they're not very different, right? I see that, but not necessarily would the latter example even be unacceptable. The way, at least, that this private letter ruling defined a retirement, it opined that there's a legitimate or bona fide retirement when somebody severs from employment—that's the key— without an expectation of returning to that employer. So if somebody—if Mr. Arasich had retired from the council at age 59 and had a wink-wink understanding or for some reason that could not— No, I understand. So if he had, on February 26, 2021, stopped working at the council, got his pension and started working at the council again a day later, you'd be able to say that's not a bona fide retirement. I think that that would be— But if it had been a bona fide retirement, which is why my hypothetical hasn't worked until that point, he could get the pension and work at the council, and you wouldn't dispute that he'd be entitled to the pension. That's correct. Even though he's working at the council, because the council is not disqualifying employment. That's correct. So what is the importance of this? I understand that you're saying that if he had filed the application for the pension on the day that he left the union, he would have been entitled to the pension. He would have—I believe he left the union at age 58, so assuming that he had already vested in his early retirement pension, and I think he had. Had he simply stopped working for the union and filed an application for an early retirement pension, he would have been entitled to collect that, yes. Oh, so that's anything. So that's even—that's the hypothetical of—that's not even a hypothetical. That's this case. So if he had requested the pension earlier when he stopped working for the union before he went to work for the council, he would have been entitled to get it, and he still could have gone to work for the council as long as the council wasn't making contributions, it wasn't a covered employer, and he would have gotten the pension and worked for the council, right? If the council was not a contributing employer, yes, he could have continued to receive— The fact that he did not request the pension at the time that he left the union, but did it a few years into the employment with the council, means that he doesn't get the pension until he stops working for the council entirely. Yes. What's the importance of that? Like, doesn't that seem like an arbitrary distinction? Well, again, I did refer earlier to the tax qualification rules, and there are—there is guidance from the IRS, there's also regulations that govern qualified tax plans, and the crux from— But why? I mean, what's the argument for that being a problem—for it being a problem in this—the way that it played out here, but not if he had requested it earlier and then went to work for the council? Your Honor, I'm not certain as to, again, why the regulations came out the way that they did. They do give plans discretion to permit payment of pension benefits under circumstances like Mr. Erickson's. This plan, if it elected to—there's an exception to regulations that would permit this plan to do this— could permit what I'll call in-service distributions to any participant who turns 59 and a half years old. I'm sure there are plenty of plans that do that. This pension plan does not have a provision that permits it to do that. That was—the trustees, as trustees of the plan, have elected not to do that. So without an exception like that, you're faced with— you're able to pay pension benefits to someone who either has reached normal retirement age or who has retired. But he's going to get early retirement, right? So if he had retired from the union at age 58, he was qualified for early retirement, he would have gotten it at that time, would have gotten the pension at age 58. That's correct. And he can go work for the council when it's not making contributions and would not be disqualified, so that would not deprive him of the pension. I agree with you. So he could have his pension and be working for the council, and you're saying there'd be no problem. But because he requested the pension a year and a half later, or two years later, at 60, he can't get the pension at all until he stops working for the council, even though the council is non-disqualifying employment. Yes, again, I understand this may seem like a unique situation, but that's the way that the plan has been drafted. There's no allegation that the terms of the plan violate— I guess my question is, why isn't that arbitrary? What is the importance of that distinction? What? Why does it make sense to say, well, if he had requested it at 58 when he left the union, he could have the pension and work at the council. But because he requested the pension at 60, after he already started working for the council, he can't have the pension and work for the council. Why? I think, again, based on the directive from the plan document that the trustees interpreted with the intent of maintaining the plan's tax-qualified status, that's the conclusion that they reached. It's also a conclusion that has been found to be reasonable and not arbitrary and capricious by both this court—I understand it was a different panel in the Metzgar decision— similar facts, where I'd say they're actually probably a more extreme set of facts where the participants actually began receiving their benefits, and there was at least, as Your Honor suggested earlier, a reinterpretation of an existing plan term where the trustees changed course, I think it's fair to say, as to how they treated a similar situation. There's also the Maltese case, which we cited in our brief out of the Northern District of California. And in all of these cases, while it may seem that, again, I would say, unlike Mr. Arasich, participants did rely on plan terms, or at least their understanding from the trustees or the fund office, that they— I mean, I guess I'm just asking why this distinction makes sense, and you're telling me, like, lots of courts have said it's okay, and you think that the IRS wants it this way. But, I mean, you think the IRS's role is arbitrary? I mean, I'm just asking—I just want to know an argument for why this distinction is important. It's not just the IRS guidance. Again, I think there's a lot of benefits associated with having a qualified taxman. You can have employer deductions. You can have, I think, tax-free— Yeah, but you're telling me that if he had requested the pension two years earlier when he left the union and then went to work at the council, the IRS would have no problem with him getting a pension and working full-time at the council in his current role because it would be non-disqualifying. But since he requested it two years later, then it is a problem for him to work at the council and get the pension. Right? That's your position. Yes, but it's not just that he requested it two years later. He requested it two years later after he had taken a new role in covered employment, and he never separated from that employment. Does the fact of his having worked at the council for two years affect the amount of the retirement benefit he would get? I think that he would have, Your Honor, added a couple years of pension credits, yes, so it increased his benefit. And also, this has not been flushed out that much today, but by working through age 60, which working for the council enabled him to do, he entered into a situation where he could get retiree welfare benefits under the welfare fund. We haven't talked about the welfare fund that much today. But under the plan document for the welfare fund, which is a summary plan description, participants do not become eligible for retiree welfare unless they work until age 60 and retire. Now, this may be some speculation, but Mr. Arasich attempted to retire very shortly after he turned 60, and would not have been entitled, under any definition of retirement, to get retiree welfare coverage had he done this prior to turning age 60. So there's not only some improvement to the status of his pension benefits by working a few more years with the council, but he bridged the gap to turning age 60 to be able to- Is this clause dealing with requiring a participant to have separated from covered employment, is that standard? Is that a standard phrase, or is it a commonly used provision in such plans? Your Honor, I can't speak for, I mean, the short answer is I don't know. But I do know that in some of the cases we- The short answer is off in the back. Yeah, in the cases that, there are very few cases, I think, that have touched on issues like this or that are similar to the issues in this case. But, again, in the Metzgar case, in the Maltese case, while maybe there weren't provisions that specifically used the term separate when defining retirement, ultimately, well, actually, in the Metzgar case, they eventually amended the plan to include such a provision, and that's why there was maybe some suspicion about whether or not there had been an amendment for the purpose of an anti-cutback claim. Just following up on one of Judge Keir's questions, what are those additional benefits that he would get in addition to his retirement benefit if he waited until he was 60, which he would have to do if he changed employment? Well, he would have accrued an additional, I think, two or three years of pension credit, and the way that the pension benefit is calculated is, I think, it's a multiple of your years of service or your pension. Right, but you also referred to some other benefits, some other common benefits. Oh, under the, so there are two funds that are appellees here. There's the pension fund. There's also the welfare fund. Yes. Under the welfare fund, participants do not become eligible for retiree welfare coverage as opposed to coverage while you're an active employee unless you work until age 60 and then retire. So by virtue of, under Mr. Arasich's definition of retire, by working for the council, he bridged the gap between call at age 57 and age 60, turned age 60, and then, in his view, retired, which would have enabled him, if he's right, to have received welfare coverage from the welfare fund in this case, despite the fact that he continues to work for the council and takes a salary and is, again, in most people's, I think, ordinary understanding of the term, not retired. But there are two different. Most people's understanding of the term retired, but he's not retired from the council, but the question is whether he's separated from covered employment. He's not working as a covered employer anymore, right? He no longer works for a covered employer. So if he's not working as a covered employer and was previously, what do you call that? Does that mean he's separated from covered employment? I would say it. One of your honors corrected Mr. Smith earlier. The plan document does not say that to retire you must cease to be in covered employment. It does say you must- I think it was me, so, like, I can understand both sides. I'm asking you now, you know, so you say he was working at covered employment, and now he is not working at covered employment. Does that not imply that there was a separation from covered employment between those two times? Respectfully, I would say it does not imply that there was a separation. It implies something, but he is no longer in covered employment. The funds have acknowledged that since the administrative claim. So he's no longer in covered employment, even though he was previously, but he never separated from covered employment. That's your position? That's our position, and if there is some ambiguity, as the district court concluded that there was, there is a very deferential arbitrary standard of review that does apply to the trustee's interpretation, not only did they consider the language in the plan document, they looked at the SPD, which I understand is not a plan document, but tells participants that to be able to start their benefits they have to stop working, and they also considered the tax qualification rules that they're required by the plan document to do, and Judge Bracetti laid out those three factors in reaching his conclusion that the denial of the benefits claim was not arbitrary and capricious. What did the plan summary say about this? So the plan summary in a section on your eligibility for benefits, I think it's at appendix 185. Because we have law that says that pretty much controls at least people's expectations. Well, people's expectations, yeah, I might agree with that. But that I would concede is clearer than the plan document. The summary plan description says that, I think it says in order to start receiving your benefits, then it lays out three things. One of those is you must stop working. That's what the summary plan description says on this issue. Well, that would be odd if somebody retired from covered employment and then got a, you know, moved to a better climate and got a job in retirement as people frequently do. Does that mean they don't get their pension to start with or they lose it? No. So this is a provision on what I call the threshold requirement to commence your pension benefit. It doesn't have any bearing on whether once you have commenced receipt of your pension benefit, that benefit could be suspended. I think there are also certainly provisions in the plan document that discuss suspension of benefits. I'm sure that there are in the SPD as well. So in Mr. Arasich's case, for example, had he stopped working and started receiving his benefits, he could go work for any employer, as your honors pointed out, provided that it's not a contributing employer to the plan, and that would not be disqualifying employment. So had he moved to Florida and started working for some company, even if it's in the same line of work, that would not constitute disqualifying employment and he'd be able to do that. Okay. Thank you very much, Mr. Clark. We'll turn it back to Mr. Smith on rebuttal. I'd like to state if possible the SPD issue that you brought up, the stop working issue. So if you go to appendix page 185, there is a statement that says that how do I apply for my pension benefits? You must meet the following conditions before your pension benefits begin. You must be eligible for a pension, you must stop working, and you must file a written application with the Board of Trustees. The stop working, though, language in the SPD, first of all, is trumped by the plan document, but even assuming the argument that you want to just go with the SPD, you can't read that stop working language in a vacuum because on the same page before that, there is certain work that is forbidden where your pension will be canceled for months in which you've worked if you are engaged in any employment that's covered by a collective bargaining agreement. Wouldn't you assume that what the booklet says would not be slightly contradictory to what the plan says? If the plan has an ambiguity in it, you could look to the booklet given to employees in order to find out what everybody understands is the arrangement? I think it would be the other way around. The plan document controls, and here where you have unambiguous language, that to retire means you must be separated from covered employment. It doesn't just say separated from employment. That's basically their argument. That's all it says. But the trustees specifically included the word covered, and you're rendering the term covered nugatory if you don't consider that as part of the analysis of whether or not he was retired. I guess your argument about the summary plan description would also be that it says you must stop working right after a whole section called work after retirement, so it can't literally mean you have to stop working. Exactly. It's only certain kinds of work is what it would mean. That's right. Doesn't that support the trustees' position because it must mean you must at least stop working at the employer where you were working at the moment you applied for pension benefits? No. No, it doesn't at all. The forbidden work that's listed specifically says that it's work that's covered by a collective bargaining agreement with the union. So even if you went by that provision, and you shouldn't because the case law says the plan document always controls and trumps, but even assuming you went by that, Mr. Arasich is not covered by any collective bargaining agreement, and so under any definition you want to utilize, he is retired. And let's back all the way up. We're at the pleading stage, and Twombly says that all he needs to do to get into the discovery stage and avoid a 12B6 motion is assert, quote, factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaints allegations are true. So with all due respect to counsel's speculation and discussion about facts that I don't believe he has any probative, that are probative because I don't think he has any personal knowledge of, we need discovery here so we can find out exactly what the trustee's intent was, if there's a history in the trustee's minutes, for instance, as to what retirement meant. But if you were going to decide it, even at the dispositive motion stage, you could look at the plain language in the plan that says separated from covered employment, and you could find that my client has retired, and therefore, since he's retired, submitted an application. You could. You could. But the question is, is it arbitrarily capricious to find the opposite? Well, that's not the only question. Under the Frommer-Conkright analysis, you would defer if their analysis was, quote, reasonable. But if you find that it just wasn't correct, for instance, if you look at the plan and you look at the internal revenue code and say, hey, that's a direct violation of 411D6. Then that would be a violation of the law, which would be arbitrary. And capricious in that definition. And that's exactly what we're alleging in the complaint. We've pled adequately that there is a violation of the law. There's a violation of 204G with the concomitant internal revenue code provision 411D6. The cutback of Mr. Arasich's pre-retirement expectation of being able to engage in certain post-retirement work. And if you need, you've got the U.S. Supreme Court telling you that that is a violation of the anti-cutback provision if you modify it. In this, I think it was Kirkendall, but this court reserved decision on whether or not 204G can include a constructive amendment. But whether you consider it as a constructive amendment or an actual amendment, for the purposes of this motion, we allege that there's an actual amendment. He alleges it was sufficient facts to survive a 20-year analysis. You allege there's an actual amendment, meaning that the trustees actually changed the plan without telling anybody? Well, if you're saying that somebody who has separated from covered employment is not retired, yes, that is an amendment. No, but that's constructive. You're saying they just interpreted it in a way that effectively amends it. But you don't actually think that there's, or maybe you do, that they actually changed the words of the plan but didn't tell anyone about it. I don't think that Hines requires an actual change in the terms of the plan. Okay, no, no, that's good. I just thought you were saying something different. So you're saying that this would be a constructive amendment to the plan? I think it's that, and as applied to Mr. Arasich as well. Remember, this is a very political environment, so we don't know exactly what happened here. But you might be swayed. Let's say, since we're going to engage in hypotheticals and speculation, let's say we look at the trustees' minutes and we see 100 other people who retired between 16 and 65, stayed with their same employer and received retirement benefits. Now, that starts to assist you in your Bayesian analysis of the hypotheticals. At this point, there is no other person you can point to who was in Mr. Arasich's position and got the benefits? Yes, I believe there is. I don't think I should say his name, but I believe there is an employer that continued to, I believe, based on my conversations, I believe that there was at least one other person who owned his own company, retired under the plan, continued to work for his own company. I think it's still in existence. Now, this is just my upon information belief, so I'm not saying that's the case. But was it a case where, I understand, maybe this isn't in the record, and so we should think about that, but I guess I'm just curious, is it an example where the person was continuously employed by the same employer, but the employer ceased contributions to the plan, and that's what allowed for the pension? And the trustees awarded a pension under those circumstances? I don't want to make that representation to the court. I think discovery, though, is appropriate here, and it's appropriate to get into the discovery stage, and I think if you apply the concept of Twombly, he certainly has stated factual allegations sufficient to pass muster on a 12B6 motion. Okay. Thank you very much. Thank you for your time. Mr. Smith, the case is submitted, and because that is the only argued case this afternoon, we are adjourned. Thank you.